**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00321 (JEB)** |
| **v.** | : | |
| | : | |
| **CALEB JONES,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Caleb Jones to three months of home detention, a probationary term of three years, no less than 60 hours of community service, and $500 in restitution.

**I.    Introduction**

The defendant, Caleb Jones, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Caleb Jones pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a three-month home detention sentence is appropriate in this case because (1) defendant ignored the barricades and police presence, the defendant scaled the wall of the U.S. Capitol to gain access to an unauthorized point of entry; (2) instead of leaving the U.S. Capitol while rioters were damaging the U.S. Capitol, defendant took pictures of the rioting and sent text messages and photographs to individuals who

were not present; (3) defendant entered the U.S. Capitol through the Senate Wing of the U.S. Capitol and continued to take pictures and film inside of the U.S. Capitol; and (4) defendant remained inside of the U.S. Capitol for approximately fifteen minutes; leaving the U.S. Capitol only after being subjected to tear gas administered by law enforcement officers who were attempting to evict the defendant and other rioters from the U.S. Capitol.

Jones was interviewed by law enforcement. Jones admitted to the facts outlined above and identified himself in photographs shown to him from January 6 by the FBI. Jones expressed remorse for his behavior after he was interviewed.

## I.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 19 (Statement of Offense), at 1-5. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Caleb Jones' Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Caleb Jones traveled to Washington, D.C., from his home in Ohio to attend the "Stop the Steal" rally. After attending the rally, Jones walked to the U.S. Capitol. Jones observed individuals removing barricades erected to prevent entry into the U.S. Capitol. Jones scaled a U.S. Capitol wall to access the first floor of the U.S. Capitol's exterior, as indicated in the photo below. Jones scaled the building and reached the first floor. A press photograph of Jones depicts him scaling the wall.



Once Jones reached the first floor, he photographed the mob of rioters as they continued to approach the U.S. Capitol, as shown in the photo below.



Jones continued to make his way into the U.S. Capitol.  Jones stood by while other rioters

entered the U.S. Capitol, causing destruction as the rioters entered the U.S. Capitol.





Despite seeing the mayhem on the outside of the U.S. Capitol, Jones decided to enter the U.S. Capitol through the Senate Wing Door shortly after the breach of this location.  While entering, the defendant continued to photograph and film the chaos accompanying the rioters as they illegally entered the U.S. Capitol.  Jones was captured entering the U.S. Capitol on CCTV surveillance cameras.



Jones spent approximately fifteen minutes inside of the U.S. Capitol continuing to film and individuals while inside.  Jones did not enter any rooms inside of the U.S. Capitol. Jones was captured entering the U.S. Capitol on CCTV surveillance cameras.







Law enforcement officers deployed tear gas inside of the U.S. Capitol in an attempt to evict rioters from the U.S. Capitol.  Jones was subjected to the tear gas and only then decided to exit the U.S. Capitol.

*The Charges and Plea Agreement*

On March 23, 2021, Caleb Jones was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 21, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. §

5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Jones agreed to pay $500 in restitution to the Department of the Treasury.

## II.     Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545g F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of home detention, as opposed to probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and  smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the U.S. Capitol; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent

or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Jones left the "Stop the Steal" rally and walked with other rally attenders as they walked to the U.S. Capitol.  Many of the rally attenders were chanting about their belief that the 2020 Election was stolen.  Statements such as "Take back our country" and "Stop the Steal" were chanted.  As the crowd grew closer to the U.S. Capitol., rally attendees become angrier in decrying their beliefs.  Barricades and Capitol officers signaled to approaching individuals, including Jones, that the U.S. Capitol was closed and not accessible to the public on that day.  As rioters began to remove barricades to access the U.S. Capitol, Jones captured footage of rioters removing barricades.  In an act of defiance, Jones decided to ignore the fact that the U.S. Capitol was not open for visitors by creating his own method of entry - scaling the side of the U.S. Capitol to access the first floor of the Senate Wing of the Building.  Jones was not alone in this endeavor. Additional rioters scaled the wall as well.  Upon arriving at the top of the first floor, Jones stood over the balcony and watched the crowd of rioters as they continued to grow closer to the U.S. Capitol. Despite seeing the growing number of rioters, Jones continued to photograph and film the chaos.

Jones then turned his attention to entering the Capitol.  At this point, Jones would have seen damage being done to the U.S. Capitol.  He continued to document the   Eventually, Jones made entry through a Senate Wing door with a host of rioters all who flooded the Senate Wing of the U.S. Capitol.  Despite seeing the ongoing chaos, the chants, and disruption, Jones continued walking through the Senate Wing and into the U.S. Capitol for approximately fifteen minutes. Jones was proud of his ability to access the building and be amongst the crowd as evidenced by his communications to individuals while inside of the U.S. Capitol.  Jones did not shy away from making his presence known inside of the U.S. Capitol.  Jones was not ashamed of his conduct. In

fact, while Jones was at the U.S. Capitol, he communicated with a family member about being at the U.S. Capitol. Jones was proud to admit that he was at the U.S. Capitol and that he was able to enter the building. Jones continued to document his time inside of the Building until he was exposed to tear gas released by law enforcement officers attempting to remove rioters from the U.S. Capitol.  Jones was escorted out of the Building by Capitol officers.

The government has no evidence that Jones entered either the Senate or House Chambers or any of the offices of the Congressional members.  The government also has no evidence that the defendant used his social media Facebook account or any other social media platforms to post either photographs, video, or commentary about his conduct in the Capitol.

While the nature and circumstances of the offense supports a sentence of incarceration, for misdemeanor defendants who, like Jones, committed fewer of the non-exclusive factors listed above, the government is more likely to recommend a more lenient sentence.

### B.  The History and Characteristics of the Defendant

As set forth in the Presentence Investigation Report, the defendant has no criminal history. ECF 20 ¶¶ 26-31.  The defendant attended community college for a brief period before he withdrew.  ECF 20 ¶ 41.  The defendant is currently unemployed.  ECF 20 ¶ 45.  Jones was employed as a logistics worker at the time of the January riot. ECF 20 ¶ 47.

The defendant appears to have strong family ties with his mother and siblings.  ECF 20 ¶¶ 32-36.

Based on a review of the defendant's cell phone contents and other investigative steps, the Government currently is not aware of the defendant having an association with extremist groups, promoting violence, or engaging in any other criminal conduct.  The defendant has been fully compliant with his pre-trial conditions of release and was cooperative with law enforcement at the

time of and since his arrest.  As a condition of his plea agreement, defendant agreed to be interviewed prior to his sentencing hearing.  Jones met with FBI.  He was cooperative.  Jones identified himself from press photographs and CCTV surveillance footage shown to him.  He confirmed that he walked around the U.S. Capitol but did not enter any rooms while inside.

Notably, the defendant expressed an interest in pleading guilty at the outset of the case. When recommending an appropriate sentence, the government gives significant weight to the defendant's early resolution of this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) ("FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's scaling of a wall to participate in a riot that actually succeeded in halting the Congressional certification and seemingly proud documentation of the riot renders a sentence of home detention, as opposed to probation, both necessary and appropriate in this case.

*Specific Deterrence*

Jones circumvented the barricades and notices to not enter the U.S. Capitol by scaling a wall to get access to the Building. This shows a deliberate, intentional, and determined attempt to enter the Capitol. This conduct should not be overlooked. Despite seeing the conduct of the rioters and the activities happening inside and outside of the Capitol, the defendant continued to surveil the activity and assumedly only left the Capitol after being tear gassed.

The government acknowledges that the defendant accepted responsibility early by entering into this plea agreement. On the other hand, the defendant's decision to enter and remain for the time that he did should be considered in this Court's sentencing decision.

14

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[3] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

As described above, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and

"conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful

17

transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances present here, the Court may consider cases where defendant's aggravating conduct was reflected in statements made prior to, during, and/or after the riot. The government has requested incarceration in cases where defendants scaled the U.S. Capitol. This conduct is an aggravating factor that Courts have considered when imposing sentences. Here, other than scaling the building, Jones did not do any other disruptive conduct on January 6. Jones's conduct here is akin to cases where defendants have posted social media commentary about their behavior at the U.S. Capitol but did nothing more. In *United States v. Jessica Bustle*, 1:21-CR-00238-TFH, the Court imposed a sentence of 60 days of home detention, followed by 24 months of probation, 40 hours of community service, and $500 restitution. On January 6, Bustle entered the U.S. Capitol for approximately twenty minutes and merely walked inside of the building. Bustle did not engage in, or espouse, violence or property destruction. Bustle did, however, make incendiary social media posts about the riot before and after January 6. The Court considered the totality of Bustle's conduct including her statements when imposing a sentence of home detention. Similarly, here, Jones's conduct of scaling the wall should be considered an aggravating factor.

The Court should also consider Jones's mitigating factors: his cooperation with FBI after his plea, his early acceptance of responsibility, and the fact that the defendant is remorseful. The government believes that a three-month home detention sentence appropriately balances Jones's aggravating and mitigating conduct.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**IV.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Caleb Jones to three months' home detention, a probationary term of three years, no less than 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/  Brittany L. Reed
BRITTANY L. REED
Assistant United States Attorney
Trial Attorney – Detailee
La. Bar No. 31299
650 Poydras Street, Ste. 1600
New Orleans, Louisiana 70130
Brittany.Reed2@usdoj.gov
(504) 680-3031